**FOLKSTONE MARITIME, LTD., a Cyprus Corporation, Plaintiff and Counterdefendant–Appellee,**

v.

**CSX CORPORATION, a corporation, and CSX Transportation, Inc., a corporation, Defendants and Counterplaintiffs– Appellants,**

v.

**The M/V PONTOKRATIS, a vessel, Counterdefendant–Appellee.**

Nos. 88–2064, 88–2137.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1988.

Decided Jan. 26, 1989.

Rehearing Denied March 9, 1989.

Michael W. Rathsack, Chicago, Ill., for CSX Corp.

Michael A. Snyder, Snyder & Gerard, Chicago, Ill., for Folkstone Maritime, Inc.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and GRANT, Senior District Judge.[*]

BAUER, Chief Judge.

On May 6, 1988, the M/V *Pontokratis* was passing through the navigable channel of the Calumet River in Chicago when it ran into a railroad bridge. On May 9, Folkstone Maritime, Ltd. ("Folkstone"), a Cyprus corporation and the owner of the *Pontokratis,* a vessel under Cyprus registration, sued CSX Corporation and CSX Transportation, Inc. ("the Railroad"), the bridge's owners, alleging negligence in its operation. On May 11, the Railroad answered and asserted a counterclaim against Folkstone, alleging negligence in navigation. The Railroad also counterclaimed *in rem* against the *Pontokratis* and had the vessel arrested. The *in rem* action is the subject of this appeal.

Soon after the filing of the counterclaims, Folkstone sought a hearing in the district court to determine the amount of security required to release the *Pontokratis* from arrest. Folkstone requested the hearing pursuant to Rule E(5)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims, which limits the amount of security necessary to release a vessel in these circumstances to the lesser of twice the amount of the plaintiff's claim or the duly appraised value of the ship. The Railroad, on the other hand, asked the district court to set the amount of the release bond pursuant to 28 U.S.C. § 2464, which provides for security of twice the amount of plaintiff's claim. As the parties' positions suggest, it was clear that the Railroad's claimed damages of over $12 million far exceeded the value of even the pre-collision *Pontokratis.*

After conducting a hearing on the question of the *Pontokratis*'s value, the district court on May 27, 1988 held that Supplemental Rule E(5)(a) superseded 28 U.S.C. § 2464 and controlled the determination of the amount of the release bond. The court also held that the determination of the *Pontokratis*'s value for purposes of Supplemental Rule E(5)(a) should be based on the ship's damaged condition on the date of its arrest, not on its pre-collision condition. Pursuant to these conclusions, the district court set the principal sum of the release bond at $4.58 million. On June 2, the court denied the Railroad's motion for reconsideration or, in the alternative, for certification under 28 U.S.C. § 1292(b). On June 3, 1988, the Railroad filed the first of these consolidated appeals.

On June 6, Folkstone filed its release bond and requested the clerk to issue a Writ of Restitution ordering the Marshal to release the *Pontokratis.* The clerk refused, so on June 9, Folkstone asked the district court for an order directing the clerk to issue the Writ of Restitution. The court denied Folkstone's motion, holding that it no longer had jurisdiction over the dispute because of the Railroad's appeal filed on June 3. We reversed that ruling on June 15, however, and on June 16 the district court issued the Writ of Restitution and denied the Railroad's motion to stay the *Pontokratis*'s release pending appeal, prompting the latter to file the second of these consolidated appeals. That same day, the *Pontokratis* was released from *custodia legis* and is no longer within the district court's territorial jurisdiction.

That the *Pontokratis* is now far away is a problem, although not one dis-

* The Honorable Robert A. Grant, Senior Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

cussed in the parties' briefs. They instead battle at length over the issues of whether the district court erred in setting the release bond pursuant to Supplemental Rule E(5)(a) rather than 28 U.S.C. § 2464 or, in the alternative, whether the court should have set the bond in an amount equal to the value of the *Pontokratis* as it existed immediately before it met the bridge, not after. The significant question now, however, is whether resolution of these issues would mean anything in light of the vessel's departure. If not, the issues are moot and we lack subject matter jurisdiction over the appeal. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (noting the "familiar proposition that 'federal courts are without power to decide questions that cannot affect the rights of the litigants in the case before them'" (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971))); *In re Hilligoss*, 849 F.2d 280, 282 (7th Cir.1988) (noting our obligation to consider jurisdictional issues regardless of whether they are raised by the parties).

The Railroad wants from us a determination, in one form or another, that the district court should have set the *Pontokratis*'s release bond at a higher amount. But what are the chances of such a determination having an effect on this litigation? When the district court set the amount of the release bond in the first instance, Folkstone had two options: it could have foregone paying the release bond and left the *Pontokratis* behind to satisfy any judgment obtained by the Railroad, or it could have paid the bond and secured the release of the vessel. Folkstone obviously chose the latter course because the *Pontokratis* was worth more to it, even in its damaged condition, than the amount of the release bond. That choice illustrates a point emphasized by the Railroad—that an arrested vessel may be worth more to its owner than its "duly appraised" resale or market value, perhaps substantially more, because the owner may place a high value on the loss of the use of the vessel. As the Railroad points out, this means that the owner of an arrested vessel can be forced to pay an amount higher than the vessel's appraised market or resale value in order to secure its release. According to the Railroad, it should therefore be entitled to use this excess value as "economic leverage" over the vessel's owner, and 28 U.S.C. § 2464 should govern the determination of the amount of the release bond because Supplemental Rule E(5)(a) precludes such economic leveraging by limiting the amount of the release bond to the vessel's appraised value.

We need not consider this argument, because the vessel is gone and neither we nor the district court have the power to bring it back. *See Thyssen Steel Corp. v. Federal Commerce & Navigation Co., Ltd.*, 274 F.Supp. 18, 20–21 (S.D.N.Y.1967) ("existing authority is to the effect that the court cannot order a shipowner to harbor his ship, which is in international waters, in order that it might provide security for a plaintiff's unproven claim") (citing Supplemental Rule E(3)(a), which provides that "[p]rocess in rem and of maritime attachment and garnishment shall be served only within the district," and the advisory notes thereto); *see also The Gasconier*, 8 F.2d 104, 105 (E.D.N.Y.1924) ("a vessel discharged from arrest upon admiralty process by the giving of a bond ... returns to her owner freed forever from the lien upon which she was arrested, and can never be seized again"). So even if we were to grant the Railroad's request for a determination that it is entitled to more security, what could happen? Folkstone might send the Railroad a check for the additional amount, but that seems highly unlikely. Folkstone might sail the *Pontokratis* back to Chicago and hand it over to the Railroad, giving the latter roughly what it might have received had the release bond been set at a higher amount in the first instance, but that, too, seems doubtful. Most likely, Folkstone would do absolutely nothing, which would render any review of the district court's determination of the amount of the release bond an "empty rite," *see Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 689, 70 S.Ct. 861, 865, 94 L.Ed. 1206 (1950), and therefore moot.

The Railroad has done little to convince us otherwise. At oral argument, it claimed that the *Pontokratis* might someday sail back within the district court's territorial jurisdiction, but "might someday" is not a strong enough foundation upon which to base subject matter jurisdiction. The Railroad also argued that a ruling in its favor in this case could possibly generate the dismissal of Folkstone's *in personam* action against the Railroad that still is pending in the district court. But even aside from the fact that Folkstone's *in personam* action against the Railroad and the Railroad's *in rem* action against the *Pontokratis* are quite distinct, this argument is unconvincing, for the dismissal of Folkstone's *in personam* action would not translate into any additional security for the Railroad in this action, nor would it bring the *Pontokratis* back. Any review of the Railroad's claims, then, would still be an empty rite for purposes of this litigation.

In sum, the district court's determination of the amount of the *Pontokratis*'s release bond is water under the bridge, and the railroad's appeal is therefore

DISMISSED.